**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

HENLOPEN LANDING HOMEOWNERS )
ASSOCIATION, INC., )
                                   )
        Plaintiff, )
                                   )
    v. )          Civ. Action No. 12-308-RGA-CJB
                                   )
RUSSELL H. VESTER and JAKARA )
VESTER, )
                                   )
        Defendants. )

## REPORT AND RECOMMENDATION

This matter arises out of an action filed by Plaintiff Henlopen Landing Homeowners

Association, Inc. ("Plaintiff" or "Association") against Defendants Russell H. Vester and Jakara

Vester ("Defendants" or "Vesters") in the Court of Chancery of the State of Delaware (the "state

court action"). Plaintiff filed a Petition in the Court of Chancery seeking relief against the

Vesters, pursuant to Del. Code tit. 10, § 348, for enforcement of certain restrictions contained in

the Declaration of Covenants, Conditions and Restrictions for Henlopen Landing

("Declaration"). (D.I. 2, ex. A (hereinafter "Petition")) Defendants removed the state court

action to this Court pursuant to 28 U.S.C. § 1443(1), asserting that the state court action violated

their federal rights under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq*. (D.I. 2)

Presently pending before the Court is Plaintiff's motion to remand this action to the Court of

Chancery for lack of subject matter jurisdiction (the "motion to remand"), filed pursuant to 28

U.S.C. § 1447. (D.I. 10) For the reasons that follow, I recommend that the motion to remand be

GRANTED.

## I.   BACKGROUND

### A.   The Parties

Plaintiff is a non-profit Delaware corporation that is responsible for, *inter alia*, enforcing

the terms, rules and restrictions of the Declaration. (Petition at ¶¶ 1, 3; D.I. 11 at 1)  The

Declaration, in turn, contains certain terms, rules and restrictions to which all persons owning

property in the Henlopen Landing community are subject.  (Petition at ¶ 4; D.I. 11 at 1)

Henlopen Landing is a subdivision located in Lewes, Delaware.  (Petition at ¶¶ 1–2 & ex. A

(hereinafter "Declaration"); D.I. 13 at 1)  Defendants, a married interracial couple with four

minor children, one of whom is autistic, reside in the five-bedroom home that they own in

Henlopen Landing.  (D.I. 5 at 5, at ¶¶ 2–3; D.I. 9 at 1, at ¶ 3)

### B.   Procedural Background

On February 7, 2012, Plaintiff filed the state court action in the Court of Chancery,

seeking relief pursuant to Del. Code tit. 10, § 348, a statute relating to disputes involving deed

covenants or restrictions.  (*See* Petition)  This state court Petition sought declaratory and

injunctive relief as well as costs, expenses and attorney's fees, against Defendants for alleged

violations of the Declaration relating to an enlargement to Defendants' existing driveway, the

planting of trees, and the storage of garbage receptacles.  (*See id.*)  On March 14, 2012,

Defendants removed the action from the Court of Chancery to this Court pursuant to 28 U.S.C.

§§ 1331, 1443(1) and 1446.  (D.I. 2)  Specifically, Defendants argued that the state court action

violates their federal rights under the FHA, and thus removal is proper under 28 U.S.C. §

1443(1).  (*Id.* at ¶¶ 5, 10–14)  On March 19, 2012, subsequent to removal, Defendants filed their

Answer, Defenses and Counterclaims, alleging violations of certain of Defendants' rights under

the FHA and Delaware Fair Housing Act, Del. Code tit. 6, § 4600 *et seq.*, and seeking declaratory

and injunctive relief as well as compensatory and punitive damages and costs and attorney's fees.

(D.I. 5)  On April 24, 2012, Plaintiff filed the motion to remand.  (D.I. 10)

On May 2, 2012, this matter was referred to me by Judge Richard G. Andrews to hear and

resolve all pretrial matters, up to and including the resolution of case-dispositive motions.

Plaintiff's motion was fully briefed as of May 23, 2012, (D.I. 14), and on October 22, 2012, the

Court heard oral argument regarding the motion, (D.I. 16).

### C.    Factual Background

In November 2010, Defendants purchased their home in Henlopen Landing, and moved

into it approximately thirteen months later.  (D.I. 5 at 6, at ¶ 3)  In their Counterclaims,

Defendants allege that the Association and related entities have treated them differently from

other community residents because of their familial status (i.e., the fact that they have children),

their child's disability and their race, through the selective enforcement of Declaration

restrictions and Association bylaws.[1]  (*Id.* at 5-13, at ¶¶ 4–36)  Defendants contend that such

treatment began even before they moved into their home, when they began to receive notices and

handwritten notes regarding alleged violations of the Association's bylaws.  (*Id.* at 6, at ¶ 5)  The

receipt of these notices and notes are alleged to have continued after Defendants moved into their

home, and related to:  (1) a trailer Defendants used during their move; (2) Defendants' on-street

parking, and (3) complaints about Defendants' children.  (*Id.* at 6-7, ¶¶ 5–9)  When Mrs. Vester

asked a representative of Premier Property Management ("PPM"), the Association's property

---

[1]    As is further noted below, the sufficiency of some of these allegations is disputed
by Plaintiff.

3

management company, why she was being singled out in regard to cars parked on the street

(when several other residents are alleged to have done the same), the representative's response

was that the family's children were a factor (because many in the community believed that it

"should be a 55 and older community"), as was the family's race. (*Id.* at 6-7, at ¶ 7)

On or about June 24, 2011, Defendants submitted an application to the Architectural

Review Board ("ARB") for the Association[2] requesting approval to make several modifications

to their home. (Petition at ¶ 5 & ex. B at 1; D.I. 5 at 7-8, at ¶ 11) These modifications consisted

of the installation of an irrigation well, a gazebo, a six foot high fence that would enclose the

exterior door to the garage, and an extension to the Defendants' existing driveway. (Petition, ex.

B at 1; D.I. 5 at 8, ¶ 12) Defendants' application explained that their request relating to the fence

height was made because of their autistic son's special needs, and the request relating to the

fence location would allow them to let their dog outside in inclement weather without snow and

mud being tracked through their home. (Petition, ex. B at 1) Notwithstanding this latter

explanation, however, Defendants now allege that during a July 1, 2011 meeting with ARB

members regarding their application, Mrs. Vester explained that both requests related to the fence

were necessary in light of her child's autism. (D.I. 5 at 8-9, ¶¶ 14–15)

Ultimately, the modifications concerning the well, gazebo, and height of the fence were

approved, while the request to extend the fence to enclose the garage door was denied. (*Id.* at ¶¶

13, 16) The ARB postponed its decision regarding the driveway extension, pending its receipt of

additional documentation it had requested from Defendants regarding the slope of the driveway.

---

[2]     Pursuant to the Declaration, the ARB is the body with exclusive jurisdiction over
all modifications or alterations made on or to all existing improvements of all property in the
Henlopen Landing community. (Declaration at 23, at ¶ 7.2; D.I. 5 at 7-8, at ¶ 11)

(Petition at ¶ 6; D.I. 5 at 9, at ¶ 16)  Upon receipt of the ARB's rulings on these requests, Mrs.

Vester notified PPM that she would be appealing the decision regarding the fence location; she

requested that the decision be reconsidered in light of the ARB's approval of similar requests

from other homeowners, and she also provided a new proposal regarding the driveway extension.

(D.I. 5 at 9, at ¶¶ 17-18)  Defendants claim that they subsequently received approval for the

driveway extension request, and accordingly proceeded with that modification.  (*Id.* at 9-10, at ¶¶

19–20)

On August 6, 2011, Mrs. Vester and her child were denied access to the community

swimming pool.  (*Id.* at 10, at ¶ 21)  PPM informed Mrs. Vester that her keycard had been

deactivated because Defendants did not, in fact, have approval for the driveway extension.  (*Id.*)

On August 11, 2011, Mrs. Vester submitted a "Housing Discrimination Complaint

(Intake)" ("HUD Complaint") against Plaintiff, Plaintiff's Board of Directors and PPM, via the

website of the Delaware Division of Human Relations ("Division").  (*Id.* at ¶ 23)  By letter dated

August 22, 2011, an attorney representing the Association demanded that Defendants take

corrective action regarding the driveway modification within ten days of receipt of the letter, and

noted that failure to comply with the terms of the letter "may, and likely will, result in the

initiation of litigation" against Defendants.  (D.I. 11, ex. B)

On November 23, 2011, Mrs. Vester's HUD Complaint was officially filed.  (D.I. 5 at 10,

at ¶ 24; D.I. 13, ex. A)  Defendants alleged in the HUD Complaint that Plaintiff, Plaintiff's Board

of Directors, and PPM "engaged in unlawful discrimination in the conditions, terms, services or

facilities of sale because of race, disability and family status," and "intimidated, interfered or

coerced [Defendants] to keep [Defendants] from the full benefit of the Federal Fair Housing

Law." (D.I. 13 at 3; *see also id.* at ex. A)  By letter dated December 21, 2011, the Division

served the Association with a notice of the filing of the HUD Complaint. (D.I. 5 at 11, at ¶ 27;

D.I. 9 at 5, at ¶ 27; D.I. 11 at 3)  The Association's commencement of the state court action and

the removal of that case to this Court occurred thereafter. (*See* D.I. 2 & Petition)

## II.    STANDARD OF REVIEW

Generally, in order for a state court action to be removable to a federal district court, the

federal court must have original jurisdiction pursuant to either a federal question or diversity of

citizenship. *Parker v. Parker*, Civ. No. 10-744-LPS, 2010 WL 4627648, at *1 (D. Del. Nov. 8,

2010) (citing 28 U.S.C. §§ 1331, 1332, 1441).  "'Only state-court actions that originally could

have been filed in federal court may be removed to federal court by the defendant.'" *Kline v.*

*Sec. Guards, Inc.*, 386 F.3d 246, 251 (3d Cir. 2004) (quoting *Caterpillar Inc. v. Williams*, 482

U.S. 386, 392 (1987)); *Parker*, 2010 WL 4627648, at *1.  "'The presence or absence of

federal-question jurisdiction is governed by the well-pleaded complaint rule, which provides that

federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's

properly pleaded complaint.'" *Kline*, 386 F.3d at 251 (quoting *Caterpillar*, 482 U.S. at 392)

(internal quotation marks omitted).

The Civil Rights Removal Statue, 28 U.S.C. § 1443, provides an exception to the general

removal rule, allowing a defendant to remove a state court action to the federal district court of

the forum state if the action is pending:

> Against any person who is denied or cannot enforce in the courts of such
> State a right under any law providing for the equal civil rights of citizens
> of the United States, or of all persons within the jurisdiction thereof . . . .

28 U.S.C. § 1443(1);[3] *see also Davis v. Glanton*, 107 F.3d 1044, 1047 (3d Cir. 1997); *Brown v. Wiltbank*, Civ. No. 11-617-SLR, 2012 WL 394798, *2 (D. Del. Jan. 25, 2012). The United States Court of Appeals for the Third Circuit has emphasized that Section 1443(1) removal is a "narrow exception" to the general rule regarding removal. *Davis*, 107 F.3d at 1047; *see also Steel Valley Auth. v. Union Switch and Signal Div.*, 809 F.2d 1006, 1010 & n.5 (3d Cir. 1987) (stating that "the removal statutes [including Section 1443(1)] are to be strictly construed against removal and all doubts should be resolved in favor of remand") (citation omitted). Anything other than a strict construction of this exception would offend principles of federalism and comity, for "the provisions of § 1443(1) do not operate to work a wholesale dislocation of the historic relationship between the state and the federal courts." *City of Greenwood, Miss. v. Peacock*, 384 U.S. 808, 831 (1966); *see also Water's Edge Habitat, Inc. v. Pulipati*, 837 F. Supp. 501, 505 (E.D.N.Y. 1993); *Hous. Auth. of Newark v. Henry*, 334 F. Supp. 490, 495 & n.5 (D.N.J. 1971).

A federal court must remand a removed case "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. 1447(c); *see also Parker*, 2010 WL 4627648, at *1. The removing defendant bears the burden of demonstrating that removal is proper. *Parker*, 2010 WL 4627648, at *1 (citing *Steel Valley*, 809 F.2d at 1010). For purposes of this motion, the court must accept "all the allegations in the [defendant's notice of] removal as true." *J&J Mobile Home Park Inc. v. Bell*, 266 F. App'x 195, 196 (3d Cir. 2008).

---

[3]     Subsection 2 of 28 U.S.C. § 1443, which "provide[s] a federal forum for suits against state officers who uphold equal protection in the face of strong public disapproval," is not at issue in this motion. *Delaware v. Cannon*, Civ. Action No. 10-1156-GMS, 2011 WL 2470090, *2 (D. Del. June 21, 2011) (internal quotation marks and citation omitted).

## III.   DISCUSSION

For a federal court to sustain removal pursuant to Section 1443(1), the defendant's removal petition must satisfy a two-pronged test (the "*Rachel* test") set out by the United States Supreme Court in *Georgia v. Rachel*, 384 U.S. 780, 788 (1966). *See also Johnson v. Mississippi*, 421 U.S. 213, 219 (1975); *Davis*, 107 F.3d at 1047. That is, the removing defendant must demonstrate both (1) "that the right allegedly denied [the defendant] arises under a federal law 'providing for specific civil rights stated in terms of racial equality'"; and (2) that he is "'denied or cannot enforce' the specified federal rights 'in the courts of (the) State.'" *Johnson*, 421 U.S. at 219 (quoting *Rachel*, 384 U.S. at 792, 802); *see also Davis*, 107 F.3d at 1047; *Parker*, 2010 WL 4627648, at *2.

For the reasons set forth below, the Court finds that although Defendants' removal of this action appears to satisfy the first prong of the *Rachel* test, Defendants have failed to sufficiently establish the second prong—that they "are denied or cannot enforce" their rights under the FHA in the Court of Chancery.

### A.   The First Prong of the *Rachel* Test:  Law Guaranteeing Civil Rights Stated in Terms of Racial Equality

Defendants argue that they have satisfied *Rachel*'s first prong, in that they have raised claims asserting that they were denied their equal civil rights under the FHA. (D.I. 13 at 7) There is no dispute that the FHA is a federal statute that "specifically prevents discrimination in housing on the basis of race." *First Union Nat'l Bank v. Frempong*, No. Civ.A. 99-1434, 1999 WL 376021, at *1 n.2 (E.D. Pa. June 9, 1999) (internal quotation marks and citations omitted). However, one can bring an FHA housing discrimination claim premised not only on acts of alleged race-based discrimination, but also premised on other forms of discrimination (such as

8

that due to familial status or handicap). *See* 42 U.S.C. § 3604. In *Rachel*, the Supreme Court

explained that Congress' intent in enacting Section 1443(1) was to allow removal of claims

based upon laws "comparable in nature of the Civil Rights Act of 1866," which allowed removal

"only in cases involving the express statutory rights of racial equality," *Rachel*, 384 U.S. at 788,

790; in light of this, courts interpreting *Rachel* have routinely held that where a party brings an

FHA claim premised upon allegations of discrimination other than those based on race, such

allegations cannot support Section 1443(1) removal. *See, e.g., Sky Lake Gardens No. 3, Inc. v.

Robinson*, No. 96-1412-CIV-NESBITT, 1996 WL 944145, at \*5 (S.D. Fla. July 24, 1996)

(finding that allegations of familial status discrimination under FHA do not support Section

1443(1) removal) (citing cases); *Water's Edge Habitat*, 837 F. Supp. at 504-05 (noting that

"[a]lthough the Fair Housing Act . . . is a federal statute that arguably guarantees 'equal civil

rights' within the plain meaning of [S]ection 1443," claims based on familial status are not

"equal civil rights" under the meaning of Section 1443(1)) (citing cases). In contrast, when a

removing party has, in fact, sufficiently demonstrated that his FHA claim is premised upon

alleged racial discrimination, such claims have been routinely found to satisfy *Rachel*'s first

prong.[4]

   Here, Plaintiff challenges whether Defendants have satisfied the first *Rachel* prong. In

doing so, Plaintiff does not appear to dispute that the FHA is a statute that provides for "civil

rights stated in terms of racial equality" under the meaning of *Rachel*. Nor does Plaintiff seem to

dispute that a removing party *could* properly invoke Section 1443(1) removal premised upon a

---

[4]     *See, e.g., First Union Nat'l Bank*, 1999 WL 376021, at \*1 n.2; *Sky Lake Gardens No. 3*, 1996 WL 944145, at \*4 (citing cases); *Northside Realty Assocs. v. Chapman*, 411 F. Supp. 1195, 1197-98 (N.D. Ga. 1976).

race-based assertion of housing discrimination brought under the FHA. Instead, Plaintiff asserts
that Defendants' particular Section 1443(1) removal attempt is insufficient, in that their FHA
racial discrimination claims are nothing more than "conclusory allegations of racial
discrimination" and that "[r]emoval under 1443(1) requires *proof* of racial discrimination." (D.I.
14 at 4) (emphasis added)  Plaintiff thus appears to argue that Defendants are required to satisfy a
kind of *Twombly/Iqbal*-like pleading standard—where their allegations of race-based FHA
violations must be accompanied by sufficient facts to demonstrate the facial plausibility of such
claims in order to satisfy *Rachel*'s first prong.[5]  (D.I. 14 at 4) (arguing that Defendants are
required to and have failed to put forth a sufficiently detailed set of "facts establishing
[applicable] FHA provisions [that prohibit] racial discrimination apply in this case"); *see also*
(D.I. 16 (hereinafter, "Tr.") at 13-16)

However, courts reviewing whether a party has met *Rachel*'s first prong do not appear to
engage in the type of inquiry suggested by Plaintiff. Instead, as did the Supreme Court in *Rachel*,
these courts tend to focus their inquiry on the *nature of the right* allegedly relied upon by the
removing party. *Rachel*, 384 U.S. at 788. In doing so, these courts have simply examined the
general nature of the removing party's allegations—by looking to the content of the party's

---

[5]      In support of this proposition, Plaintiff cites only to two cases: *Water's Edge
Habitat, Inc. v. Pulipati*, 837 F. Supp. 501 (E.D.N.Y. 1993), and *Robinson v. Eichler*, 795 F.
Supp. 1253 (D. Conn. 1992). (D.I. 14 at 4)  In both cases, however, the petitioners had *not*
asserted that their removal petitions were based on FHA claims premised upon racial
discrimination; instead, they asserted FHA claims based on familial status discrimination.
*Water's Edge Habitat*, 837 F. Supp. at 504; *Robinson*, 795 F. Supp. at 1258. The *Water's Edge
Habitat* and *Robinson* Courts held that such petitions did not provide authority for Section
1443(1) removal, since they did not even attempt to *allege* racial discrimination claims. *Water's
Edge Habitat*, 837 F. Supp. at 505; *Robinson*, 795 F. Supp. at 1258. These courts said nothing
about how factually robust an allegation of racial discrimination in violation of the FHA must be
in order to satisfy the first *Rachel* prong.

notice of removal, its counterclaims and, at times, even its briefs—in order to ascertain whether the party is generally alleging that its right to be free of *racial discrimination* in housing is an impetus for its FHA discrimination claim. *See, e.g., Sofarelli v. Pinellas Cnty.*, 931 F.2d 718, 724-725 (11th Cir. 1991) (examining defendant's counterclaim in concluding that the case was properly removed under Section 1443(1) as the claims asserted racial discrimination in violation of the FHA); *First Union Nat'l Bank*, 1999 WL 376021, at *1 n.2 (considering defendant's notice of removal and the contents of its brief in support of removal, in order to conclude that the first *Rachel* prong was satisfied, as "[i]nterpreting the allegations [of race-based discrimination in lending] broadly, defendants appear to meet the first prong of *Rachel*"); *Sky Lake Gardens No. 3*, 1996 WL 944145, at *4 (citing cases that have "allowed removal based upon a defendant's Fair Housing Act counterclaim [that] have involved allegations of racial discrimination"); *Northside Realty Assocs. v. Chapman*, 411 F. Supp. 1195, 1197-98 (N.D. Ga. 1976) (finding that "the Fair Housing Act relied upon by the defendants is such a statute that satisfies the first prong of" the *Rachel* test, where defendants alleged in notice of removal that rights pursuant to FHA were violated due to racial discrimination).  The Court has not found a case where a court analyzing the propriety of Section 1443(1) removal under *Rachel*'s first prong has required a removing party to put forward conclusive *proof* of race discrimination in these documents, or has specifically weighed the plausibility of that party's factual allegations of racial discrimination in a manner akin to a Rule 12(b)(6) analysis. *Cf. Delaware v. Hefley*, Civ. No. 10-360-SLR, 2010 WL 2990139, at *2 (D. Del. July 27, 2010) ("Defendant alleges that he has been discriminated against on the basis of his race.  Hence, although alleged very generally, the allegation may provide a basis for this court's proposed exercise of subject matter jurisdiction.").

Here, the Court finds that Defendants have satisfied *Rachel*'s first prong, as there is

sufficient allegation in their Notice of Removal and in their Counterclaims of their assertion of

an FHA claim premised on a right to be free from racial discrimination in housing. In the Notice

of Removal, for example, Defendants state their intent to file an Answer, Defenses and

Counterclaims that would "assert in more detail the violations of the Federal Fair Housing

Act[.]" (D.I. 2 at ¶ 15) As to the content of those forthcoming FHA-based counterclaims, the

Notice of Removal (1) refers back to Mrs. Vester's prior HUD discrimination complaint, which

included allegations of discrimination based on "race, disability and familial status" and (2)

asserts that these FHA claims would meet *Rachel*'s first prong, noting that to do so, they must

allege the violation of a "law conferring a specific right of racial equality". (D.I. 2 at ¶¶ 8, 12)

Similarly, Defendants' later-filed Counterclaims provide indication of the race-based

nature of Defendants' FHA-related allegations. The Counterclaims themselves include Counts

alleging: (1) a violation of the FHA's 42 U.S.C. § 3604(b) ("Section 3604(b)"), asserting that

Plaintiff's actions in enforcing the Declaration and other Association bylaws and rules against the

Vesters amounted to "denying and making unavailable equal terms, conditions or privileges of

sale based on race, familial status and/or disability" (Count I); and (2) that Plaintiff's state court

action was filed because Defendants had exercised or enjoyed rights protected by the FHA, and

that the filing of the action itself violated Defendants' rights under 42 U.S.C. § 3617 ("Section

3617") of the FHA (Count III). (D.I. 5 at ¶¶ 39, 43) These Counts, in turn, are preceded by

factual allegations that appear intended to assert that Plaintiff treated Defendants differently than

other Henlopen Landing residents, due in part to the fact that Defendants are an interracial

couple. (*See* D.I. 5 at 5, at ¶ 2 (noting that Defendants are a "married interracial couple"); *id.* at

7, at ¶ 7 (noting that a PPM representative told Mrs. Vester that "race too was a factor" as to why PPM had issued numerous violation notices to the Vester family)).[6]

Therefore, in line with the type of analysis undertaken by other federal courts as to *Rachel*'s first prong, the Court concludes that the prong is satisfied, as it is sufficiently clear from the record that Defendants are alleging FHA claims that are premised on their right to be free from racial discrimination.

## B.   The Second Prong of the *Rachel* test:  Right Denied or Unenforceable in State Courts

To satisfy the second prong of the *Rachel* test, Defendants must demonstrate that they are "denied or cannot enforce" their rights under the FHA in the state court. *See Johnson*, 421 U.S. at 219; *Davis*, 107 F.3d at 1047.  In setting out the nature of this analysis, the Court will further examine Supreme Court precedent in this area.

### 1.   Supreme Court Precedent: *Rachel* and *Peacock*

Prior to the Supreme Court's decisions regarding Section 1443(1) removal in *Rachel* and *City of Greenwood, Miss. v. Peacock*, 384 U.S. 808 (1966), precedent dictated that Section 1443(1)'s 'denied or cannot enforce' prong was satisfied only if there was a facially

---

[6]      The Court acknowledges that the factual allegations in the Counterclaims tend to make more frequent reference to facts implicating discrimination based on familial status and disability than they do to facts implicating racial discrimination.  Moreover, the FHA-related Counts in the Counterclaims are pled to allege discrimination due to "race, familial status, *and/or* disability", rendering it a bit more difficult to determine whether race is intended to be invoked in some or all such claims.  (D.I. 5 at ¶¶ 39, 41, 43 (emphasis added))  However, regardless of whether such factual allegations would be sufficient to overcome a Rule 12(b)(6) motion, the Court concludes that, when they are read in context with the content of the Notice of Removal, they are sufficient to withstand the nature of the analysis under the first prong of *Rachel*.

discriminatory state law at issue that directly contradicted a federal law.[7] *Rachel*, 384 U.S. at

803; *Johnson*, 421 U.S. at 219 (stating that unless the *Rachel* exception applies, Section 1443(1)

"requires that the 'denial [of the removal petitioner's rights] be manifest in a formal expression

of state law' . . . such as a state legislative or constitutional provision") (quoting *Rachel*, 384 U.S.

at 803).  This requirement "ensured that removal would be available only in cases where the

predicted denial [of the federal right] appeared with relative clarity prior to trial." *Rachel*, 384

U.S. at 803.  Additionally, it prevented federal judges from having to undertake detailed analyses

of the likelihood of success of particular federal claims in the state courts, thus preventing federal

judges from having to engage "in the unseemly process of prejudging their brethren of the state

courts." *Id.* at 803-04.

    The Supreme Court re-examined Section 1443(1) removal in *Rachel*, establishing a

"narrow" exception to the *Strauder-Rives* doctrine. *Id.* at 804.  The *Rachel* Court was guided by

suggestions in the *Strauder-Rives* line of cases that a situation could exist where "removal might

be justified, even in the absence of a discriminatory state enactment, if an equivalent basis could

be shown for an equally firm prediction that the defendant would be 'denied or cannot enforce'

the specified federal rights in the state court." *Id.*  Indeed, such a circumstance was presented to

---

[7]    This principle, known as the *Strauder-Rives* doctrine, originated in a set of companion cases in which the Supreme Court "established a relatively narrow, well-defined area in which pre-trial removal could be sustained under" Section 1443(1)'s predecessor statute. *Rachel*, 384 U.S. at 796; *see also Strauder v. West Virginia*, 100 U.S. 303 (1879) (finding removal proper where state statute allowing only white males to serve on juries was in direct conflict with petitioner's federal right to a jury selected without discrimination based on race); *Virginia v. Rives*, 100 U.S. 313 (1879) (finding removal improper where defendants' removal petition asserted that the community exhibited racial prejudice against them and that they could not obtain a fair trial before a jury composed of white men, but did not reference any state statute explicitly sanctioning such discrimination and admitted that black male citizens could lawfully serve as jurors).

the *Rachel* Court.

In *Rachel*, the defendants filed a removal petition under Section 1443(1), alleging that

they were arrested for refusing to leave a Georgia restaurant when they were requested to do so

by the person in charge, because of their race. *Id.* at 782–83. The arrests were made pursuant to

a Georgia state statute that made it a crime (a trespass) to refuse to leave another person's

property upon request by the owner. *Id.* at 783. The federal district court remanded the case to

Georgia state court, and the defendants appealed to the United States Court of Appeals for the

Fifth Circuit. *Id.* at 784. While the case was pending, Congress enacted the Civil Rights Act of

1964 ("the Act"), which granted individuals the right to "'full and equal enjoyment' of the

facilities of 'any place of public accommodation' without discrimination on the ground of race."

*Id.* at 785, 792–93. Section 203(c) of the Act provided that "[n]o person shall . . . (c) punish or

attempt to punish any person for exercising or attempting to exercise any right or privilege"

secured by other provisions of the Act. *Rachel*, 384 U.S. at 793. In *Hamm v. City of Rock Hill*,

379 U.S. 306 (1964), decided while *Rachel* was pending in the Fifth Circuit, the Supreme Court

held that Section 203(c) "prohibits prosecution of any person for seeking service in a covered

establishment, because of his race or color"—essentially, that "punish" means the same thing as

"prosecute" for purposes of this provision. *Hamm*, 379 U.S. at 311; *see also Rachel*, 384 U.S. at

793-94. Based upon the passage of the Act and the *Hamm* decision, the Fifth Circuit reversed the

district court, and the Supreme Court granted certiorari to consider the case. *Id.* at 785.

The *Rachel* Court affirmed the Fifth Circuit's reversal, finding that if the removal petition

allegations were true (i.e., that the defendants were asked to leave solely for racial reasons), then:

> [T]he mere pendency of the prosecutions enables the federal court to make
> the clear prediction that the defendants will be "denied or cannot enforce

> in the courts of (the) State" the right to be free of any "attempt to punish"
> them for protected activity. . . . The burden of having to defend the
> prosecutions is itself the denial of a right explicitly conferred by the Civil
> Rights Act of 1964.

*Id.* at 805. If the defendants were indeed asked to leave the restaurant based solely on their race,

the *Rachel* Court explained that it was no answer that the defendants might eventually prevail in

state court. *Id.* This was because the defendants had a federal right to do that for which they

were being prosecuted, and it was the *prosecution itself* that violated the federal statute's

prohibition against punishment for such conduct. In such circumstances, the Supreme Court

held, the Act "substitut[ed] a right for a crime" and effectively "immunized from prosecution"

any "nonforcible attempts to gain admittance to or remain in" places of public accommodation.

*Id.* at 804–05 (internal quotation marks and citations omitted).

In *Rachel*'s companion case, *City of Greenwood, Miss. v. Peacock*, 384 U.S. 808 (1966)

(decided on the same day as *Rachel*), the Supreme Court granted a motion to remand

consolidated criminal prosecutions. In *Peacock*, the defendants were involved in voter

registration drives and had been charged with violations of various Mississippi laws (including

obstruction of public streets, contributing to the delinquency of a minor, operating a motor

vehicle with improper license tags and assault and battery by biting a police officer). 384 U.S. at

810-13. Defendants later removed their cases pursuant to Section 1443(1), alleging violations of

their rights under the Constitution and the Voting Rights Act, 42 U.S.C. § 1971 *et seq. Id.* The

*Peacock* Court, which ultimately found that defendants were not entitled to remove these cases,

emphasized two "significant" differences as compelling the opposite result from that in *Rachel*.

*Id.* at 826.

First, in contrast to *Rachel*, where the federal law had "specifically and uniquely

16

conferred upon the defendants an absolute right to 'violate' the explicit terms of the state

criminal trespass law," in *Peacock*, "no federal law conferr[ed] an absolute right on private

citizens . . . to obstruct a public street, to contribute to the delinquency of a minor, to drive an

automobile without a license, or to bite a policeman." *Id.* at 826-27.  Second, unlike the Civil

Rights Act at issue in *Rachel*, which contained an explicit prohibition against prosecution for

activities in which those defendants were engaged, in *Peacock* "no federal law conferr[ed]

immunity from state prosecution" on the charges at issue. *Id.* at 827.

 This second point was supported by a footnote (footnote 25) that became important in

later analyses concerning whether anti-intimidation provisions (such as Section 3617 of the

FHA)[8] operate in the same way as an anti-prosecution provision (such as that in *Rachel*), in the

context of Section 1443(1) removal. *See id.* at 827 n.25. *Peacock's* footnote 25 stated that:

> Section 203(c) of the Civil Rights Act of 1964, 42 U.S.C. 2000a-2(c)
> (1964 ed.), the provision involved in *Hamm* . . . and . . . *Rachel* . . .
> explicitly provides that no person shall "punish or attempt to punish any
> person for exercising or attempting to exercise any right or privilege"
> secured by the public accommodations section of the Act.  None of the
> federal statutes invoked by the defendants in the present case contains any
> such provision.  See note 3 and note 7, supra.

*Id.*  Footnote 3, cross-referenced in footnote 25, set out the relevant provisions of the Voting

Rights Act that were at issue in *Peacock*, including 42 U.S.C. § 1971(b) (1964), which provided

that "[n]o person . . . shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or

coerce any [other] person for the purpose of interfering with the right of such other person to vote

---

[8]    Section 3617 states that "[i]t shall be unlawful to coerce, intimidate, threaten, or
interfere with any person in the exercise or enjoyment of, or on account of his having exercised
or enjoyed, or on account of his having aided or encouraged any other person in the exercise or
enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of [the FHA]."
42 U.S.C. § 3617.

or to vote as he may choose." *Id.* at 812 n.3. Immediately following citation to this provision,

footnote 3 stated, "See also § 11(b) of the Voting Rights Act of 1965, 79 Stat. 443, 42 U.S.C. §

1973i(b) (1964 ed., Supp. I)." *Id.* Section 1973i(b) prohibited the intimidation, threatening, or

coercion of any person aiding another in voting or attempting to vote, and was enacted following

the initiation of the state prosecutions underlying the defendants' removal petitions. *See Hill v.*

*Pennsylvania*, 439 F.2d 1016, 1020 (3d Cir. 1971) (examining *Peacock's* footnote 25 and noting

that Section 1973i(b) was "enacted subsequent to the initiation of the state prosecution sought to

be removed" in *Peacock*).[9]

Accordingly, having concluded that removal of the prosecutions-at-issue was improper,

the *Peacock* Court explained that a contrary holding in the case would "mark a complete

departure" both from the requirements of Section 1443(1) itself and from the *Strauder-Rives* line

of caselaw. *Peacock*, 384 U.S. at 827. The *Peacock* Court reiterated what the *Strauder-Rives*

decisions had established—that is, that a defendant seeking Section 1443(1) removal cannot

prevail on a mere showing that a defendant's federal equal civil rights have been denied by state

officials in advance of trial, that the charges against defendant are false, that the defendant could

not obtain a fair trial in state court, or that the officers bringing the state charges have corrupt

motives. *Id.* This is because such assertions do not equate to clear indication that the defendant

"will be denied or cannot enforce" his federal rights in the state court. *Id.* at 827-28.

Emphasizing the narrowness of the exception created in *Rachel*, the *Peacock* Court stated that

---

[9]     As is discussed further below, some courts have relied on *Peacock's* footnote 25
to find that the scope of removal under Section 1443 is "limited to statutes containing explicit
anti-prosecution language, as was the case with [Section] 203(c) of the Civil Rights Act of 1964
in *Rachel*." *Emigrant Sav. Bank v. Elan Mgmt. Corp.*, 668 F.2d 671, 675 (2d Cir. 1982).

under Section 1443(1):

> [T]he vindication of the defendant's federal rights is left to the state courts
> except in the *rare situations* where it can be *clearly predicted* by reason of
> operation of a pervasive and explicit state or federal law that those rights
> will *inevitably be denied by the very act of bringing the defendant to trial
> in the state court.*

*Id.* at 828 (emphases added).[10]

In articulating the difference between the outcomes in *Rachel* and *Peacock*, the Third

Circuit has explained:

> The line between *Rachel* and *Peacock* is that between prosecutions in
> which the conduct necessary to constitute the state offense is specifically
> protected by a federal equal rights statute under the circumstances alleged
> by the petitioner, and prosecutions where the only grounds for removal is
> that the charge is false and motivated by a desire to discourage the
> petitioner from exercising or to penalize him for having exercised a federal
> right.

*Davis*, 107 F.3d at 1051 (quoting *Johnson*, 421 U.S. at 234 (Marshall, J., dissenting)).

### 2.    Applying *Rachel* and *Peacock* to the Instant Case

Here, resolution of Plaintiff's motion to remand turns on whether the circumstances at

issue fall within the ambit of *Rachel*, or instead are more like the facts of *Peacock*.

Unsurprisingly, Defendants argue that their case is "a lot closer to *Rachel* than [] to *Peacock*,"

(Tr. 42:3–5), while Plaintiff disagrees.

---

[10]     The *Peacock* Court was also careful to stress that a defendant's failure to make a
sufficient Section 1443(1) showing does *not* mean that he has not suffered a denial of federal
rights. *Peacock*, 384 U.S. at 828. The Court explained that such a defendant very well may have
experienced a grave injustice, but that removal in such an instance is not the appropriate solution;
instead, he should turn to other remedies established to redress these kinds of wrongs, including,
*inter alia*, vindication of his federal claims upon appellate review (if necessary), an injunction,
federal habeas corpus, or civil and criminal sanctions. *Id.* at 828–830; *see also Johnson*, 421
U.S. at 228 ("[T]here are varied avenues of relief open to these defendants for vindication of any
of their federal rights that may have been or will be violated.").

### a.   *Rachel* and *Peacock*'s First Difference

As to the first difference that distinguished *Peacock* from *Rachel*, here the Court finds

that the federal law (the FHA) cannot be said to have "specifically and uniquely conferred upon"

Defendants the "absolute right to violate the explicit terms of" the state law at issue, Del. Code

tit. 10, § 348 ("Section 348"). Section 3604(b) of the FHA makes it "unlawful to discriminate

against any person in the terms or privileges of sale . . . of a dwelling, or in the provision of

services or facilities in connection therewith, because of race [and other types of status]." 42

U.S.C. § 3604(b). Unlike the provision of the Civil Rights Act at issue in *Rachel*, nothing in this

section of the FHA (or the others asserted by Defendants) can be said to give Defendants the

right to violate Section 348, or Delaware state laws requiring compliance with deed covenants

and restrictions. That is, even if Defendants believed that they were victims of discrimination in

the enforcement of the Declaration, the FHA's provisions did not grant them a clear right to

disregard state law that otherwise requires them to abide by such a covenant (and, thus, abide by

the Declaration's provisions regarding driveway alteration, safety, and placement of garbage

receptacles—provisions that the state court Petition alleges that Defendants have violated). (*See*

Petition) Viewed a different way, the Delaware law at issue does not permit infringement of any

federal right Defendants might possess, such that there is no basis for the prediction that the state

court would deny federal rights as a result of following state law. *Emigrant Sav. Bank v. Elan*

*Mgmt. Corp.*, 668 F.2d 671, 675 (2d Cir. 1982) ("Since New York law does not permit

infringement of any federal right [removing party] might possess, there is no basis for the

prediction, as there was in *Strauder* and *Rachel*, that the state court would deny federal rights as a

result of following state law.").

Other courts examining the question of Section 1443(1) removal in cases involving FHA claims have repeatedly come to the same conclusion—that the FHA's provisions did not give the removing party the right to violate an otherwise facially neutral law. *See, e.g., Emigrant Sav. Bank*, 668 F.2d at 675 (noting that Section 3605 of the FHA does not confer a right for a party to refuse to make payments of principal or interest, and that if a party was foreclosed upon pursuant to the New York statute at issue, nothing in that statute "would preclude a New York court from giving appropriate consideration" to a plea that Section 3605 provided a defense to the claim); *New York v. Davis*, 411 F.2d 750, 753 (2d Cir. 1969) (finding in case involving New York menacing statute allegedly invoked against removing party to intimidate him from exercising rights under FHA, that, unlike in *Rachel*, where the "conduct charged as a criminal offense, to wit, not leaving the restaurants on request, was alleged by the defendants to be the very activity in which the Civil Rights Act gave them a right to engage", here the FHA "confers no right to menace or assault anyone, including persons who have allegedly demonstrated hostility to its purposes"); *Vill. of Chestnut Ridge v. Town of Ramapo*, No. 07-CV-9278 (KMK), 2008 WL 4525753, at *13 (S.D.N.Y. Sept. 30, 2008) (FHA does not give defendants right to "ignore facially-neutral state environmental regulations", as "unlike the state defendants in *Rachel*, that allegation [of violation of state law] is not mutually exclusive with any right [removing party] has to own, rent or sell property under the FHA"); *Akhlaghi v. Berry*, 294 F. Supp. 2d 1238, 1245 (D. Kan. 2003) (FHA does not permit defendants to "engage in the specific conduct of which plaintiff accuses them (*i.e.*, failing to pay rent)"); *First Union Nat'l Bank*, 1999 WL 376021, at *1 n.2 (FHA does not give defendants the right not to pay property taxes); *Water's Edge Habitat*, 837 F. Supp. at 506 ("FHA confers no federal right to violate the facially valid Village ordinance

21

limiting the number of occupants in the dwelling"); *Henry*, 334 F. Supp. at 500 (FHA does not sanction rent strikes).

At oral argument, Defendants' counsel relayed a belief that individuals could, pursuant to Delaware law, freely disregard such covenants if those individuals held a subjective belief that discrimination was at play in the enforcement of the covenants. (Tr. at 39-40) The Court is unpersuaded by such an assertion, and has not been directed to any authority in support thereof. *Cf. Emigrant Sav. Bank*, 668 F.2d at 675 ("Neither in text nor by fair implication does [Section 3605 of the FHA] endow a person who considers himself a victim of discrimination in the financing of housing with a right to take the law into his own hands . . . and refuse to make payments of interest or principal."); *Vill. of Chestnut Ridge*, 2008 WL 4525753, at *12 (finding that removing party "cannot credibly claim . . . that it had a right, under the FHA . . . to ignore facially-neutral state environmental regulations"). For these reasons, after examining the first of the Supreme Court's two asserted differences between *Rachel* and *Peacock*, the instant case appears more like the latter, suggesting remand is appropriate.

### b.    *Rachel* and *Peacock*'s Second Difference

The Court will next examine the second difference that the Supreme Court noted between *Rachel* and *Peacock*: whether it can be said that the FHA "confers immunity [upon Defendants] from state prosecution" (via the anti-intimidation language of Section 3617) as to civil claims like those being made in the instant state court Petition. Indeed, this is the thrust of Defendants' argument—that the FHA granted them certain federal civil rights to be free from housing-related discrimination, and that the filing of the state court Petition itself violates those rights, as it has the effect of intimidating Defendants from attempting to exercise those rights. (D.I. 13 at 7, 12-

13)

i.    **Section 1443(1) Removal Cases Involving FHA Claims**

In support of this argument, Defendants rely primarily upon two cases, *Northside Realty Assocs. v. Chapman*, 411 F. Supp. 1195 (N.D. Ga. 1976) and *Sofarelli v. Pinellas Cnty.*, 931 F.2d 718 (11th Cir. 1991), in which Section 1443(1) removal was upheld based on FHA claims. Notably, these are two of only a few cases in which courts have denied motions to remand pursuant to Section 1443(1). (*See* D.I. 14 at 9 (pointing out that "Defendants could only find three cases (in addition to the seminal Supreme Court ruling in *Rachel*) where federal courts permitted removal under 1443(1)"))

In *Northside Realty*, the United States had filed a civil contempt action in state court against Northside Realty Associates ("Northside") and Ed. A. Isakson, accusing them of violating a permanent injunction that had enjoined certain violations of the FHA. *Northside Realty*, 411 F. Supp. at 1196. During the course of discovery in the contempt action, Northside learned of an organized program in which "testers" had audited and checked Northside and other real estate firms' compliance with the FHA. *Id.* at 1196–97. Northside filed a class action on behalf of itself and other similarly situated companies against the testers in state court asserting various claims. *Id.* at 1197. The testers removed the action to federal court pursuant to Section 1443(1), alleging that Northside's state court action had been initiated against them to coerce, intimidate, threaten, and otherwise interfere with the testers' exercise and enjoyment of rights under the FHA. *Id.* In response, Northside moved to remand the action, arguing that removal was improper under Section 1443(1) because the testers' conduct underlying Northside's claims was "not within the scope of activity protected by a federal civil rights act." *Id.*

23

The *Northside Realty* Court denied Northside's motion to remand, finding that the "mere bringing of the state court action [] violate[d] the defendants' rights" under Section 3617 of the FHA, as that Section makes it "unlawful to coerce, intimidate, threaten or interfere with any person" for having aided or encouraged another person in the exercise or enjoyment of rights granted by certain provisions of the FHA. *Id.* at 1199. Thus, the *Northside Realty* Court found that the allegations in defendants' removal petition fell within the scope of the exception enunciated by the *Rachel* Court, and therefore the action would remain in federal court. *Id.* at 1999. The defendants would then have the opportunity to prove their allegations (i.e., that they were in fact engaged in activity protected by Section 3617, that the state court action was in fact brought against them in retaliation, and that it had the effect of coercing, intimidating, threatening, and otherwise interfering with their protected rights), with the plaintiffs free to argue to the contrary. *Id.* at 1199–1200.

Importantly, the *Northside Realty* Court's holding was based largely upon the reasoning of the Fifth Circuit in *Whatley v. City of Vidalia*, 399 F.2d 521 (5th Cir. 1968), which considered a Section 1443(1) petition for removal alleging violations of rights protected by the Voting Rights Act. *Whatley*, 399 F.2d at 522. In *Whatley*, the removing defendants alleged that they were arrested while encouraging voter registration, conduct that they claimed was protected from prosecution by Section 1973i(b) of the Act, which expressly prohibited any "'person, whether acting under color of law or otherwise'" from "'intimidat[ing], threaten[ing], or coerc[ing] . . . any person for urging or aiding any person to vote or attempt to vote.'" *Id.* at 522 & n.2 (quoting 42 U.S.C. § 1973i(b)). The question of whether the removing defendants satisfied the second *Rachel* prong rested on whether this anti-intimidation language could be equated with the anti-

prosecution language contained in the statute at issue in *Rachel*, *id.* at 525, which the Supreme

Court had declared effectively "'substitute[d] a right for a crime.'" *Peacock*, 384 U.S. at 831

(quoting *Hamm*, 379 U.S. at 315).

The *Whatley* Court held that such language could be so equated, drawing from a

concurring opinion in *North Carolina v. Hawkins*, 365 F.2d 559 (4th Cir. 1966) (Sobeloff, J.,

concurring). In that opinion, Judge Sobeloff compared the anti-prosecution provision at issue in

*Rachel* with Section 1971(b) of the Voting Rights Act and concluded that the latter anti-

intimidation provision "'is a more, not less, sweeping prohibition of official acts of harassment

against equal civil rights than the limited proscription'" of the Civil Rights Act's anti-prosecution

provision, "'since attempts to punish are only one means of coercing, threatening, or

intimidating.'" *Whatley*, 399 F.2d at 525 (quoting *Hawkins*, 365 F.2d at 562 (Sobeloff, J.,

concurring)). The *Whatley* Court agreed with this comparison and found it equally applicable to

the anti-intimidation provision before it (Section 1973i(b) of the Voting Rights Act). In doing

so, it acknowledged that the *Peacock* Court did not rely upon the Voting Rights Act's anti-

intimidation language to uphold removal, but surmised that the *Peacock* Court had not done so

for one of two reasons. *Id.* First, the *Whatley* Court posited, the removing defendants in *Peacock*

had not argued that the anti-intimidation language compelled removal (as they did not have the

benefit of the *Rachel* decision, which came out the same day as the *Peacock* decision). *Id.* at

525-26. Alternatively, the *Whatley* Court speculated, the *Peacock* Court may have found Section

1971(b) inapplicable to the facts before it, as it was enacted at the same time that Congress

broadened the Act in 1965 by adopting Section 1973i(b)—*after* the relevant events in the case

had occurred. *Id.* at 526. The *Whatley* Court noted that, whatever the case, the "Supreme Court

has *not* held that these words [comprising the anti-intimidation provision] do not comprehend spurious prosecutions for protected rights." *Id.* at 526 (emphasis added).

Accordingly, the *Whatley* Court concluded that the removing defendants had successfully invoked "a statute which on its face prohibits any intimidation, threat, or coercion, whether done by a public official or by a private individual, for engaging in the acts that Congress has given them the absolute right to carry out." *Id.* The *Whatley* Court concluded that, in these circumstances, the removing defendants had adequately stated facts which, if proven true, would allow the federal court to make "'an equally firm prediction that [the removing defendants] would be denied or cannot enforce the specified federal rights in the state court.'" *Id.* (quoting *Rachel*, 384 U.S. at 804).

In *Sofarelli*, the second case heavily relied upon by Defendants, property owners filed a state court action seeking an injunction to stop Michael Sofarelli from transporting a house by trailer into their neighborhood via a public roadway. *Sofarelli*, 931 F.2d at 720. A local newspaper published an article that quoted some of the property owners as revealing racial motivations behind their action. *Id.* Sofarelli removed the case to federal court under Section 1443(1), alleging that the state court action violated his rights under the FHA because his intention to transport the house to a lot, which he would then sell to a minority buyer, was protected activity under the FHA. *Id.* at 720-25. Accordingly, Sofarelli further contended that the filing of the state court action violated Section 3617 of the FHA, as it constituted an unlawful interference with the exercise of his FHA rights. *Id.* at 722.

However, as Plaintiff points out, (D.I. 11 at 7), the main issue in dispute in *Sofarelli* was not whether Section 1443(1) removal was proper; instead, it was whether Sofarelli had pled

26

sufficient facts regarding his FHA claims against certain of the property owners. *Id.* at 720–23,

725. Indeed, the *Sofarelli* Court did not address the substance of the *Rachel* test, as "[t]he parties

*[did] not dispute* that" Sofarelli's allegations fell within the scope of *Rachel*.[11] *Id.* at 724–25

(emphasis added). In addition to noting the lack of dispute about the issue, the *Sofarelli* Court

cited to *Northside Realty* in concluding that the action was properly removed pursuant to Section

1443(1). *Id.* at 725.

The Court does not find *Northside Realty* or *Sofarelli* to be persuasive here. Neither case

provides a detailed analysis as to whether Section 3617 of the FHA can be utilized to bring a case

such as this within *Rachel*'s second prong. Moreover, a number of subsequent cases have

ultimately rejected the reasoning cited in *Northside Realty* (and that in *Whatley*, the Fifth Circuit

case heavily relied on by *Northside Realty*) in a manner the Court finds persuasive.

These cases are best exemplified by a line of precedent from the United States Court of

Appeals for the Second Circuit, concluding with the decision in *Emigrant Sav. Bank v. Elan*

*Mgmt. Corp.*, 668 F.2d 671 (2d Cir. 1982). In that case, defendant Elan Management Corp.

("Elan") had agreed to purchase an apartment building in poor condition and make necessary,

extensive repairs, bringing the building up to building code specifications. *Id.* at 672. In return,

Prudential Savings Bank (which later merged with plaintiff Emigrant Savings Bank, or

"Emigrant"), holder of the largest of three mortgages on the building, promised to issue a new

mortgage reflecting the building's improved condition and waive interest payments until July

---

[11]     *See also Alabama v. Conley*, 245 F.3d 1292, 1298 n.9 (11th Cir. 2001) (noting that the *Sofarelli* Court did not "squarely address" the second prong of *Rachel* "as the parties did not dispute that Sofarelli's allegations fell within the holding of *Rachel*"); *Vill. of Chestnut Ridge*, 2008 WL 4525753, at *13 (same).

1979. *Id.* Elan upheld its end of the agreement, spending $100,000 on repairs, correcting the code violations, and satisfying the two other mortgages. *Id.* After Elan's negotiations with Emigrant to reconstruct the mortgage were unfruitful—and an Emigrant representative allegedly advised Elan that the bank would not issue a new mortgage due to the racial makeup of the apartment's tenants—Elan filed complaints with the New York State Banking Department and the Federal Deposit Insurance Corporation. *Id.* Shortly after Emigrant received notification of these complaints, it filed a state court action against Elan to foreclose the mortgage. *Id.* at 673. In response, Elan filed a civil action in the United States District Court for the Eastern District of New York alleging violations of, *inter alia*, the FHA, and petitioned for removal of the state court action pursuant to Section 1443(1). *Id.* Elan argued that removal was proper because Emigrant's refusal to issue a new mortgage on the basis of the tenants' race violated Section 3605 of the FHA, which prohibits a bank from denying a loan or discriminating against a person in regard to the conditions of a loan because of race. *Id.* Further, Elan contended that the state court foreclosure action was filed in retaliation for Elan's exercising of rights under the FHA, thus violating Section 3617 of the FHA. *Id.*

In *Emigrant*, the Second Circuit affirmed the district court's decision to grant Emigrant's motion to remand the case back to state court. *Id.* The *Emigrant* Court found that while the first prong of *Rachel* was satisfied, the second prong was not. *Id.* at 673, 675-76. As to the second prong, it characterized the *Whatley* Court's position (that *Peacock's* footnote 25 did *not* serve to contrast the Civil Rights Act's anti-prosecution provision with anti-intimidation provisions found in other statutes) "as not a fair reading of *Peacock.*" *Id.* at 675 n.4. The *Emigrant* Court emphasized that *Peacock's* footnote 25 stated that the federal statutes at issue there did not

28

contain anti-prosecution provisions like that at issue in *Rachel*, and then immediately cited to

*Peacock*'s footnote 3, which set out the anti-intimidation language of the Voting Rights

Act—language that is "in relevant respects almost identical to" Section 3617 of the FHA. *Id.* at

674. Additionally, the *Emigrant* Court pointed out that the Civil Rights Act at issue in *Rachel*

also contained an anti-intimidation provision, Section 203(b) (which directly preceded the anti-

prosecution provision), "[y]et the Court in *Rachel* relied solely on the 'punish or attempt to

punish' language of" Section 203(c). *Id.* To the *Emigrant* Court, it was clear that the *Rachel* and

*Peacock* Courts were limiting "the scope of the intended expansion [of the permissible range of

Section 1443(1) removal] to statutes containing explicit anti-prosecution language." *Id.* at 675.

Based on this conclusion, the Second Circuit rejected Elan's argument that Section 3617

prohibited the state court action. *Id.* at 675-76. The Court described the distinction between

anti-prosecution provisions (such as Section 203(c) of the Civil Rights Act) and anti-intimidation

provisions (such as Section 3617 of the FHA):

> Under the former language the very bringing of the state prosecution
> against a member of the protected class violates federal law and no
> purpose is served by making a class member present in a state court a
> defense which that court is bound to accept. Under the latter type of
> statute there would have to be a preliminary determination whether the
> bringing of the foreclosure action was or was not a forbidden
> "intimidation." Furthermore, where as here the asserted intimidation is a
> civil action to enforce property rights, it is not clear that dismissal is
> demanded.

*Id.* at 676. Also notable to the *Emigrant* Court was the fact that *Peacock* was decided almost two

years before Congress passed the FHA, and so the framers of the statute could have easily

included a right of removal with respect to violations of the statute's provisions. *Id.* The Second

Circuit did not foreclose the possibility of a case arising where the FHA would operate to justify

Section 1443(1) removal, but held that *Emigrant* was not that case. *Id.*[12] Accordingly, the Court

held that "a mortgagor cannot remove a foreclosure action based upon allegations that refusal to

restructure the mortgage was racially motivated and that the action was brought because of its

complaints on that score where the state's foreclosure law is not in conflict with any federal law

or the Constitution." *Id.*; *see also Vill. of Chestnut Ridge*, 2008 WL 4525753, at *13 (rejecting

argument that state environmental litigation should be removed, as it was meant to intimidate

defendant from exercising his rights under the FHA, pursuant to Section 3617, as this would

require "some finding that the action was an unlawful attempt at intimidation" and "this Court is

not empowered to substitute its authority for that of the state courts in addressing [defendant's]

claims").

On the question of whether anti-intimidation language operates in the same way as anti-

prosecution language in the context of Section 1443(1) removal cases, the Court finds the Second

Circuit's conclusion more persuasive than that of *Whatley* and *Northside Realty* for several

reasons. First, the Court agrees with the *Emigrant* Court's detailed analysis of the import of

*Peacock's* footnote 25. *See Emigrant Sav. Bank*, 668 F.2d at 674-675 & n.4. The *Whatley* Court

appeared not to attribute any meaning to *Peacock's* footnote 25, instead suggesting its own

conclusions as to why the *Peacock* Court did not invoke the anti-intimidation provisions of the

---

[12]    Here the Court referenced its prior decision in *New York v. Davis*, 411 F.2d 750
(2d Cir. 1969), where it had set out a hypothetical in which a claim under the FHA might justify
Section 1443(1) removal. The *Davis* Court hypothesized that a "true parallel" to *Rachel* under
the FHA would be "if [the defendant] were being prosecuted under a statute forbidding tenancy
by persons not approved by a majority of the dwellers in an apartment house and the removal
petition alleged that the basis for disapproval was Davis' being a party to a mixed marriage."
*Davis*, 411 F.2d at 753. "In such an instance, on the facts claimed by the defendant, [Section
3604 of the FHA] would have substituted a federal right to occupy the apartment for what the
state had branded as a crime." *Id.*

Voting Rights Act to justify removal in that case. *See Whatley*, 399 F.2d at 523-26. Clearly, however, the *Peacock* Court's statement in footnote 25, that the statutes before it did *not* contain provisions resembling the Civil Rights Act's anti-prosecution provision, supplemented by a cross-reference to the Voting Rights Act's anti-intimidation provisions, must have had some meaning. The *Emigrant* Court's conclusion after its careful reading of *Peacock*'s footnote 25—that the Supreme Court did not find anti-intimidation language in statutes like the Voting Rights Act or Section 3617 of the FHA to have the same impact on removal as did the Civil Rights Act's anti-prosecution language in *Rachel*—gives force to what the Supreme Court actually said regarding anti-prosecution and anti-intimidation provisions.

Second, the conclusion that anti-intimidation provisions do not operate identically to anti-prosecution provisions respects the limits of Section 1443(1). A central theme woven through Section 1443(1) jurisprudence is the narrowness of this exception; it is meant to be confined to "the rare situations where it can be clearly predicted by reason of the operation of a pervasive and explicit state or federal law that [the defendant's] rights will inevitably be denied by the very act of bringing the defendant to trial in the state court." *Peacock*, 384 U.S. at 828; *see also, e.g.*, *Emigrant Sav. Bank*, 668 F.2d at 674 ("The narrowness of the extension of [the Strauder-Rives doctrine] made in *Rachel* was immediately demonstrated in *Peacock*."). A contrary conclusion—that the two types of provisions are indeed identical in the Section 1443(1) context—would undermine this important theme.

This conclusion relates to the *Whatley* Court's statement that anti-intimidation provisions like Section 3617 are more sweeping prohibitions of official acts of harassment against equal civil rights than are anti-prosecution provisions. Perhaps the *Whatley* Court is correct that an

31

anti-intimidation provision sweeps in more prohibited acts—that in comparison, anti-prosecution

provisions offer "limited proscription"—but again, the scope of Section 1443(1) removal is

meant to be circumscribed. The *Rachel* Court dictated that in order for a federal court to sustain

removal, that court must be able to "clear[ly] predict[]" that the removing defendant "will be

denied or cannot enforce in the courts of (the) State the right to be free of any attempt to punish

them from protected activity." *Rachel*, 384 U.S. at 805. And as *Rachel* emphasized, the anti-

punishment language at issue there allowed a court to make this clear prediction because the

*filing of the state court action itself* served as the punishment, and so the "burden of having to

defend the prosecution[] is itself the denial of a right explicitly conferred by" the relevant federal

statute, making Section 1443(1) removal appropriate. *Id.* Therefore, in those circumstances, it

was clear and unquestionable that the defendant would be denied or could not enforce his rights

under federal law, without any further need to predict what the *outcome* of the state court case

might be, and so "no purpose [was] served by making a [defendant] present in a state court a

defense which that court is bound to accept." *Emigrant Sav. Bank*, 668 F.2d at 676.

Anti-intimidation language does not operate identically. Where a removing defendant is

relying upon an anti-intimidation provision like Section 3617, it is far less clear than it was in

*Rachel* that the mere bringing of the state court action is itself a violation of federal law. Rather,

for the filing of a state court action like that here to violate Section 3617, a number of

determinations must be made by a factfinder, such as whether the bringing of the state court

action was a forbidden "intimidation" under the statute's meaning. *See, e.g.*, *Emigrant Sav.*

*Bank*, 668 F.2d at 676; *Vill. of Chestnut Ridge*, 2008 WL 4525753, at *13.

Third, the Court notes that several other district courts faced with similar Section 1443(1)

removal petitions based on the impact of Section 3617 have reached the same conclusion as the Court does here. *See, e.g.*, *Vill. of Chestnut Ridge*, 2008 WL 4525753, at *13 (noting that Section 3617 was "unlike" the anti-prosecution provision of the Civil Rights Act and did not immunize parties from state court litigation); *Akhlaghi*, 294 F. Supp. 2d at 1245 (stating that the FHA does not "permit defendants in this case to refrain from paying their rent and, thus, there is nothing about the state court lawsuit itself that will deny defendants their civil rights"); *First Union Nat'l Bank*, 1999 WL 276021, at *1 n.2 (concluding that even if Section 3617 "meets the standards set forth in *Rachel*," removal was nonetheless inappropriate because "[n]othing in Section 3617 . . . gives defendants the right not to pay property taxes or immunizes them from foreclosure proceedings").

### ii.   Third Circuit Caselaw Regarding Section 1443(1) Removal

The Court's conclusion, that Section 3617's anti-intimidation language does not operate in the same manner as the anti-prosecution language at issue in *Rachel*, is consistent with Third Circuit precedent. The Third Circuit has examined Section 1443(1) removal in detail in two non-FHA cases, *Hill v. Pennsylvania*, 439 F.2d 1016 (3d Cir. 1971) and *Davis v. Glanton*, 107 F.3d 1044 (3d Cir. 1997).

While *Hill* did not involve the FHA, it did involve an anti-intimidation provision, the contents of which the Third Circuit found did *not* justify removal. In *Hill*, the removing defendants had been charged with state law crimes, including assault and battery and inciting to riot, stemming from their participation in public demonstrations supportive of racial equality in employment in Pittsburgh's construction industry. *Hill*, 439 F.2d at 1018. The removing defendants alleged that they had been lawfully engaged in activities designed to enforce federal

33

civil rights, that the arrests were made to deny them of these rights, and that they were denied or could not enforce such rights in the Pennsylvania state courts. *Id.* In their Section 1443(1) removal petition, the removing defendants claimed that 18 U.S.C. § 245(b), which prohibited forceful intimidation or interference with anyone encouraging others to seek equal employment, immunized them from prosecution for their conduct (and thus was the equivalent of the anti-prosecution statute in *Rachel*). *Id.* at 1018–19.

Ultimately rejecting this argument, the Third Circuit began its analysis by considering the differences in *Rachel* and *Peacock. Id.* at 1019-21. The *Hill* Court pointed out (as the Court has above) that in the course of granting remand, the *Peacock* Court referenced the anti-intimidation provision in 42 U.S.C. § 1973i(b), which was enacted after the initiation of the state prosecution in that case. *Id.* at 1020. The *Hill* Court surmised that this provision "arguably would have protected the petitioners' actions," but ultimately concluded that remand would have still been granted "because even if one considers section 1973i(b), the situation in *Peacock* would have *still* lacked the distinguishing feature of *Rachel*, the statutory substitution of a right for a crime." *Id.* at 1020-21 (emphasis added). The *Hill* Court recognized that anti-prosecution and anti-intimidation provisions do not operate identically as to Section 1443(1) removal actions, explaining that:

> The statutes relied upon in *Rachel* necessarily displaced any state laws which would proscribe the act of remaining in public accommodations when asked to leave on account of his race by prohibiting attempted punishment for this act. However, when statutes, such as those relied upon in *Peacock*, grant one a right not to be intimidated for efforts to accomplish a particular goal or while asserting a specific right, we cannot ascribe to Congress an intent to displace state laws which regulate one's conduct while attempting to exercise the right unless, of course, the federal right permits specific acts which are proscribed by state law, or the state law, in effect, forecloses a reasonable possibility of engaging in acts

34

> necessary to assert the federal right. The Court in *Peacock* recognized that
> a right not to be intimidated while seeking to accomplish a goal could be
> frustrated by specious arrests and subsequent criminal prosecutions.
> However, the Court held that such possibilities, similar to those here
> alleged, would not provide a basis to predict that the claimed right would
> inevitably be denied in a state court . . . .

*Id.* at 1021 (citation omitted).

The *Hill* Court found that removal was improper. *Id.* at 1021-22. In reaching this

conclusion, in addition to the analysis set out above, the *Hill* Court also emphasized two factors

particular to Section 245(b): (1) that the legislative history regarding the law made it clear that

"Congress did not intend to displace the state laws under which the petitioners were charged,"

and (2) that the text of Section of 245(b) emphasizes that the provision was aimed at the

prohibition of *forceful* intimidation, and so was "not intended to displace the ordered functioning

of state legal processes." *Id.* at 1021-22. Accordingly, the anti-intimidation provision failed to

immunize the removing defendants from prosecution, as the Third Circuit could not "clearly

predict a denial of [removing defendants'] rights under Section 245(b) from the mere pendency

of the state prosecutions." *Id.* at 1022.

It is true that the decision in *Hill* turned in part on these latter two aspects of Section

245(b). However, the broader point emphasized in *Hill*—that *Peacock* recognized that a right

not to be *intimidated* while seeking to accomplish a goal did not provide a basis to predict that

the claimed right would be *inevitably denied in a state court*—is consistent with the Court's

decision here. In line with the rationale expressed in *Hill*, while Section 3617 of the FHA does

"grant one a right not to be intimidated for efforts to accomplish a particular goal or while

asserting a specific right," the Court cannot ascribe to Congress an intent to displace a state law

like Section 348 that regulates Defendants' conduct while attempting to exercise that right. *Id.* at

1021. The federal rights at issue here (those provided by the FHA) do not "permit specific acts" proscribed by Section 348, nor does Section 348 itself "foreclose a reasonable possibility of engaging in acts necessary to assert the federal right." *Id.*

In the *Davis* case, the defendants, trustees of the Barnes Foundation, removed a defamation action brought against them in Pennsylvania state court to federal court under Section 1443(1). *Davis*, 107 F.3d at 1045. Prior to the state court action, the Foundation had filed a federal suit pursuant to 42 U.S.C. §§ 1983 and 1985 against certain of plaintiffs, claiming that plaintiffs had conspired to discriminate against the Foundation due to racial prejudice. *Id.* at 1045-46. In *Davis*, the defendants contended, *inter alia*, that the very filing of the state court action represented an attempt to intimidate and retaliate against them for exercising their federally protected rights, in violation of 42 U.S.C. § 1985(3). *Id.* at 1050.

However the *Davis Court*, repeatedly noting the "narrow" "limited" and "unique" circumstances that were at play in *Rachel*, rejected this argument and affirmed remand, finding that defendants' argument for removal did not satisfy *Rachel*'s second prong. *Id.* at 1048-51. The *Davis* Court contrasted the circumstances in *Rachel*, where it was clear that the language of the Civil Rights Act protected against prosecution for exercising a right under the Act, with the language of Section 1985(3). *Id.* at 1050-51. In doing so, it noted that Section 1985(3)'s only reference to a prohibition on "intimidation" related to the right to vote, and that nothing else about the content of Section 1985(3) could be said to immunize defendants from having to face a civil defamation lawsuit, even under the circumstances at issue there. *Id.* at 1050-51. The *Davis* Court concluded that even assuming that plaintiffs had a "retaliatory motivation" in bringing the defamation action, the case was clearly outside the contours of *Rachel*'s "narrow exception,"

because it amounted to a circumstance where the "'only grounds for removal is that the

[allegations of defamation are] false and motivated by a desire to discourage [defendants] from

exercising or to penalize [them] for having exercised a federal right.'" *Id.* at 1051 (quoting

*Johnson*, 421 U.S. at 234) (Marshall, J., dissenting). It also found that "removal is not warranted

by the concern . . . that a denial of equal rights may take place and go uncorrected at trial" as this

would require the Court to "second-guess the impartiality of our state court brethren, and this

outcome is exactly what the court in *Rachel* and *Peacock* counseled against." *Id.*

The Court's ruling here is in line with the contours of the Third Circuit's holding in

*Davis*, in that, as expressed above, it respects the limited and narrow nature of the exception set

out in *Rachel*. Similarly, as in *Davis*, here the only grounds for removal urged by Defendants are

that the allegations of a violation of the Declaration are false and motivated by a desire to

discourage or penalize defendants from having exercised federal rights (pursuant to the FHA).

*Davis* did make reference to the holdings of *Whatley, Sofarelli*, and *Northside Realty*.

*Id.* at 1051. The *Davis* Court distinguished these cases by stating:

> *Whatley* is not apposite because the removing defendants in that case
> specifically invoked the provisions of the Voting Rights Act of 1965,
> which provides that "[n]o person shall intimidate, threaten or coerce . . .
> any person for urging or aiding any person to vote or attempt to vote." *Id.*
> at 522 n.2 (citing 42 U.S.C. § 1973i(b)). Thus, because Congress had
> specifically immunized the action in question, the state court defendants
> could not be prosecuted for encouraging individuals to vote. The cases of
> *Sofarelli* . . . and *Northside Realty* are similarly unhelpful. In those cases,
> the removing state court defendants invoked [Section 3617]. Thus, no
> person who had encouraged another to take advantage of the Fair Housing
> Act could be prosecuted, and the filing of the suit itself violated the
> removing defendants' civil rights. As previously discussed, the Trustees
> cannot avail themselves of such a provision, for § 1985(3) does not
> immunize them from a civil defamation suit.

*Id.* This statement in dicta could be read, as Defendant does, (D.I. 13 at 12), to suggest that the

37

*Davis* Court would have supported a removal petition like the one here, which is premised on an invocation of the FHA's Section 3617. However, the Court finds that the better reading of this portion of *Davis* is that, while it acknowledges the conclusions reached in cases like *Sofarelli* and *Northside Realty*, it is not meant as a definitive statement that, under the circumstances at issue here, the Third Circuit would find removal to be appropriate. Such a conclusion better harmonizes with the reasoning behind the underlying decision in *Hill* (and that in *Davis*), particularly regarding the narrow scope of cases that fall within the exception set out in *Rachel*. It is also in line with the result in *First Union Nat'l Bank v. Frempong*, No. Civ. A. 99-1434, 1999 WL 376021, at *1 n.2 (E.D. Pa. June 9, 1999), the only post-*Davis* decision by a district court in this Circuit to have addressed the propriety of Section 1443(1) removal premised upon a Section 3617 claim. The *First Union National Bank* Court, citing to the *Davis* decision, found that removal of a state court foreclosure proceeding was improper because *Rachel*'s second prong was not satisfied, even where defendants had alleged that the foreclosure action was "part of a conspiracy of retaliation against them for having engaged in conduct protected by § 3605 and § 3617 of the Fair Housing Act." *Id.* The *First Union National Bank* Court concluded this removal was improper, *inter alia*, because "[n]othing in Section 3617 . . . immunizes [defendants] from foreclosure proceedings." 1999 WL 376021, at *1 n.2. So too, nothing in Section 3617 immunizes Defendants here from defending a state court proceeding in which it is alleged they violated a covenant.[13]

---

[13]      Defendants also assert that the Court should apply the method of analysis of Section 1443(1) removal claims set out in *Conrad v. Robinson*, 871 F.2d 612, 615 (6th Cir. 1989), where the Sixth Circuit "looked not at the method of analysis in the charging document or petition for removal but, rather, at the acts by the defendant at issue to see if they constituted or were tied to protected activity." (D.I. 13 at 13-14) The Third Circuit has expressly declined to

### iii.    Conclusion

Therefore, in light of the Court's conclusion that Section 3617 does not operate in the same manner as the anti-prosecution provision in *Rachel*, remand is appropriate, as both of the factors that rendered *Peacock* different from *Rachel* are also present here. The FHA does *not* confer upon Defendants the right to engage in the conduct that is the subject of the state court action, and neither does Section 3617 of the FHA confer upon Defendants immunity from having to defend the state court action. Therefore, there is nothing about the very act of bringing the state court action that can be clearly predicted to deny Defendants their civil rights. Defendants are free to assert their counterclaims (i.e., that Plaintiff is racially motivated and attempting to unlawfully intimidate Defendants for exercising their FHA rights) in state court, with the state court empowered to address the merits of those claims without interference from this Court. Therefore, the Court finds that remand to the Court of Chancery is appropriate.

---

embrace *Conrad*'s method of analysis of Section 1443(1) removal claims, *Davis*, 107 F.3d at 1052 ("We need not pass on whether we will follow *Conrad* . . . ."), and even Defendants admit that they "do not concede that *Conrad* is controlling," (D.I. 13 at 13). However, even if *Conrad were* the appropriate method of analysis here, Defendants' contentions are unpersuasive. In *Conrad*, the Sixth Circuit found a very close connection between the removing defendant's acts at issue (statements to a newspaper that were the subject of plaintiff's state court libel action against defendant) and his protected activity (the filing of EEOC race discrimination and retaliation charges against a union and plaintiff in federal court), where the allegedly libelous statements that he made were *clearly and facially about his federal court discrimination suit.* 871 F.2d at 615-16. Here, any connection between Defendants' acts (for example, relating to their driveway extension) and their federal right to be free from discrimination in housing under the FHA is not nearly as closely connected as was the case in *Conrad*. *Cf. First Union Nat'l Bank*, 1999 WL 376021, at *1 n.2 (applying *Conrad* analysis but finding no close connection between defendant's non-payment of taxes and any protected conduct such that removal is appropriate).

C.   **Defendant's Request, in the Alternative, that Court Remand Only State Deed Enforcement Claim**

Finally, the Court recommends rejection of Defendants' request that, in the event the Court believes that Plaintiff's Petition would be more appropriately decided in the state court, the Court remand only the state deed enforcement claim (brought under Section 348), and retain the federal and state fair housing claims (brought under the FHA and the Delaware state equivalent of that statute). (*See* D.I. 13 at 14-15)  For support on this point, Defendants cite only to *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1197-98 (9th Cir. 1988), for the general proposition that where federal and state court claims have been joined, the court has the power to retain the federal claims and remand the state law claims.  However, *Emrich* did not concern Section 1443(1) removal, and thus does not persuade the Court that these claims should be severed.

The analysis in a Section 1443(1) decision relates to whether a state court—the Court in which Plaintiff chose to bring suit—can allow for the removing party to assert and exercise its federal rights.  Having found here that the state court is such a place, and respecting the principles of federalism underpinning the Section 1443(1) analysis, the Court concludes that the entirety of this litigation should be remanded to the Court of Chancery. *See, e.g., Vill. of Chestnut Ridge*, 2008 WL 452573, at *13 (remanding case and stating that "this Court is not empowered to substitute its authority for that of the state courts in addressing the merits of [the defendants'] claims").

IV.   **CONCLUSION**

For the reasons set forth above, Defendants have failed to carry their burden of demonstrating that removal is appropriate under 28 U.S.C. § 1443(1).  Accordingly, this action should be remanded to the Court of Chancery because this Court lacks subject matter

40

jurisdiction. I therefore recommend that this Court GRANT Plaintiff's motion to remand.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss

of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-

79 (3d Cir. 1987); *Sincavage v. Barhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order in Non-Pro Se Matters For

Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is

available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: April 19, 2013

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE